(No. 63803.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID HENDRICKS, Appellant.

*Opinion filed July 3, 1990.—Modified on denial*
*of rehearing October 1, 1990.*

32

MILLER, J., took no part.

Appellate citation: 145 Ill. App. 3d 71.

David Hendricks, of Menard, appellant *pro se.*

Mercer Turner, of Bloomington, Thomas D. Decker and Richard H. McLeese, of Thomas D. Decker & Associates, Ltd., and Jon R. Waltz, all of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart and Robert J. Ruiz, Solicitors General, and Mark L. Rotert, Scott Graham, Terence M. Madsen and Richard S. London, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, Robert J. Biderman, Denise J. Ambrose and David E. Mannchen, of the State's Attorneys Appellate Prosecutor, of Springfield, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, David Hendricks, was arrested on De-

cember 5, 1983, based on an information filed by the Mc-Lean County State's Attorney, for the murders of defendant's wife, Susan Hendricks, and his three children, Rebekah, Grace and Benjamin Hendricks. The McLean County grand jury subsequently filed an eight-count indictment on December 22, 1983. Counts I, III, V, and VII charged that the defendant committed murder with intent to kill Benjamin, Grace, Rebekah, and Susan, respectively (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)); counts II, IV, VI, and VIII charged that the defendant committed the murders of Benjamin, Grace, Rebekah, and Susan, respectively, knowing that his actions created a strong probability of death or great bodily harm (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)). On defendant's motion for a change of venue, the McLean County circuit court conducted the trial in Winnebago County. The jury found the defendant guilty of murder on all counts. The defendant waived the jury for the sentencing phase; the circuit court found defendant eligible for the death penalty but sentenced the defendant to four consecutive terms of natural life imprisonment and imposed a fine and costs. The appellate court affirmed (145 Ill. App. 3d 71), and this court allowed defendant's petition for leave to appeal (107 Ill. 2d R. 315(a)). This court filed an opinion on December 20, 1988, affirming the judgment of the courts below. On rehearing and reconsideration of its earlier opinion, this court now reverses and remands for the reasons stated herein. We address only those issues raised by the defendant which are pertinent to our decision.

Defendant's wife and three children were found murdered in the bedrooms of their home in Bloomington by police officers on November 8, 1983. All four were apparently murdered in their sleep (there were no signs of struggle or defense wounds); an ax and a kitchen butcher knife, which apparently were used to stab and bludgeon the family to death, were found near the bodies

of the three children. There was no evidence of a forced entry into the home; indeed, police found the back door of the home unlocked. The defendant left his Bloomington home late in the evening of November 7, 1983, on a business trip to Wisconsin.

No direct evidence links the defendant to the murders of his wife and children. The prosecution's case was entirely premised on intensely disputed circumstantial evidence; in particular, the prosecution relied on evidence which appeared to indicate that the children were dead prior to the time that the defendant stated that he left on his business trip and on evidence which the prosecution argued showed the defendant's motive for killing his family. Prior to our discussion of the evidence which the prosecution labeled as "motive evidence," we will briefly describe the defendant's business and the last afternoon and evening that Susan and the children were known to be alive.

At the time of the murders, the defendant owned an orthotics business in Bloomington known as CASH Manufacturing, Inc. The corporation was named by Hendricks for the Cruciform Anterior Spinal Hyperextension orthosis, a specific type of back brace which the defendant developed, patented and manufactured. Although at an earlier time in his career the defendant had been involved with patient care in orthotics and prosthetics, he had since limited his work to the development, manufacture and sales aspects of the business. The corporation employed two persons, the defendant and an office manager, Beverly Crutcher, who handled correspondence, general bookkeeping and scheduling, as well as the day-to-day management of the corporation's office. In marketing his products for sale, the defendant utilized brochures which pictured the products worn by a model and presented the advantages of his product. This

methodology was described as fairly standard in the industry.

Testimony at the trial showed that the defendant at times traveled in order to secure additional professional customers who would prescribe or utilize his products as opposed to other products and had taken several business trips in the year preceding the murders. The defendant's office manager testified that she was aware of the plans for the November 7 Wisconsin trip the week prior to its inception. Additional evidence showed that it was not unusual for the defendant to leave his home during the late night-early morning hours for business purposes, though he did not always do so.

On the evening of November 7, 1983, the defendant left his office at approximately 4 p.m., returned home and worked on his motorcycle, readying it for winter storage at his airplane hangar. The defendant rode the motorcycle to the airplane hangar and jogged home. The children, who had all attended school that day, played outside until the defendant called them into the house at about 5:30 p.m. Susan left home between 5:50 and 6 p.m. to attend a baby shower in Delavan, about 35 miles west of Bloomington. Hendricks and the children went out to dinner after Susan's departure, arriving at Chuck E. Cheese's Pizza Time Theater at 6:30 p.m. The family ordered a medium vegetarian pizza and a pitcher of root beer. Under ordinary circumstances the pizza would have been prepared in approximately 15 to 20 minutes. However, the defendant indicated that they did not begin eating the pizza until about 7 p.m., when he called the children from the establishment's play area. The children ate the majority of the vegetarian pizza (defendant testified that he ate one of the 10 pieces), which consisted of pizza dough topped with cheese, sliced mushrooms, green peppers, olives, tomato slices, diced onions, and

tomato sauce, drank the root beer and returned to the play area.

The only evidence of the children's activities at the restaurant comes from the defendant. Because the children did not want to leave the play area in the restaurant, the defendant left the restaurant in order to fill the car with gasoline in preparation for his business trip. He returned to the restaurant to get the children so that they could get to the library bookmobile before it closed. Before they could go to the bookmobile, however, they had to return home to pick up the children's books which needed to be returned. The operator of the bookmobile recalled seeing Hendricks and the children around 8 p.m. That was the last time, according to testimony, that anyone outside of the family saw the children alive.

After selecting books, the defendant and children returned home at about 8:30 p.m. Before getting ready for bed, according to defendant's testimony, they all played a few games of hide-and-seek. The defendant then read to the children and he believed that they were in bed somewhere between 9 and 9:30 p.m. While the children were getting ready for bed, the defendant indicated, he packed his suitcase for his trip and put it into his car.

In the meantime, defendant's wife, Susan, was at the baby shower, where she ate an undetermined amount of fresh vegetables (carrots, celery, and cauliflower), cookies and punch at around 9:20 to 9:30 p.m. She left the party at 9:40 p.m., returning home between 10:30 and 10:45 p.m. Defendant left on his business trip sometime after Susan's return; although at trial Hendricks testified that he believed that he left the house sometime after 11 p.m., when questioned by police shortly after discovery of the bodies he stated that he thought that he left about midnight. At any rate, defendant stated that he and Susan spoke for a period of time, including some discussion about adoption of a young boy. After kissing

his wife and children good-bye, he departed for Wisconsin.

Further details of this trip will be delineated later; for the purposes of our present discussion we merely note that calls to the Bloomington police were made by both defendant (from Wisconsin) and other members of the family when Susan and the children did not show up for a scheduled family dinner. Police discovered the bodies of the murdered family at approximately 10:30 p.m. on November 8, 1983.

The defendant has raised numerous issues for review. Prior to addressing those issues which center on the sufficiency of the evidence to convict the defendant, we will look to that testimony which has been generally referred to as the "motive" evidence.

The State's case against Hendricks was entirely circumstantial; no direct evidence linked the defendant in any way to the crime. To strengthen its case, the State attempted to show that Hendricks had killed his family because of a conflict between his religious standards as espoused by a group of Christian believers known as the Plymouth Brethren and an increasingly aggressive sexual involvement with models he came in contact with in his work. The State also introduced evidence that indicated that, in 1981, Hendricks was overweight, wore ill-fitting clothes, and had a scraggly mustache and unkempt hair. In 1983, however, Hendricks was 40 pounds lighter, had shaved his mustache, wore better tailored clothes, and had had his hair styled. Hendricks' change in appearance over a year prior to the murders was also, according to the State, support for its theory that Hendricks killed his wife rather than be ostracized from this Christian group for divorcing her in order to pursue other women.

Defendant filed motions prior to and during the trial seeking to exclude testimony about or from the models

he hired, about his religious background with the Plymouth Brethren and about his change in appearance. He argued that the information was irrelevant, immaterial, and prejudicial and was offered by the State only to inflame and impassion the jury against him. Any probative value was greatly outweighed by its potential for unfair prejudice, serving only to cast the defendant in an unfavorable light in the eyes of the jury, the defendant further asserted.

Beginning in 1981 Hendricks engaged the services of professional models to wear his brace for photographs which were included in his sales brochures. Thirteen women were permitted to testify for the prosecution at the trial based on the State's assertions that their testimony would show:

> "a pattern starting with the first couple of models, both a pattern that's both in time and in character indicating from nothing unprofessional occurring with the, with one of the models, a Mrs. Echo Atwell, to indicate a rather rapid fitting session of which no nudity was required, no fondling of the body or measuring of the body with making marks on the body, and so on, to a course of, of then escalating into greater and greater degrees of nudity and greater and greater degrees of hands on the body, marks on the body, culminating in actual fondling of sexual parts of the body, actual attempts to hug or kiss models, and other behavior of that sort."

The court ruled both orally in open court and in a prepared statement for the record on the defense motions to preclude such testimony. Orally, the court ruled:

> "that the evidence is going to be, at least at this point in time, allowed into the record. The difficulty is that it's being allowed into the record based upon, well, two general bases, first is the State's representation, both in its opening statements and in its argument on this issue this morning, as to what it's going to prove in the case, and we will not know until the evidence is in the record

whether the State has, in fact established there is a basis, and there's more than one according, as indicated. There's no question about that, that there are two bases in the evidence that I have, that I think this entry depends upon. One is what has been perhaps called acceleration or, or increasing severity of, or words to that effect, of this claim of conduct, and the second is the relationship of that, if any, to claimed religious or moral standards held by the Defendant. I don't think either one of those is [*sic*] established, going alone, is going to be sufficient to allow this evidence to stay before the Jury, but I am, I am accepting the State's representations, both in argument and in opening statement, that they're planning on, and they're prepared to prove that."

The court concluded by noting that the evidence was being "submitted on the issue and only on the issue of motive."

In a prepared statement included in the record only in the presence of the court clerk and the court reporter, the court elaborated on its earlier oral ruling:

"I further find that this evidence does have a certain prejudicial effect, which is outside or different than the motive basis for its admission. This prejudice is greater or lesser depending upon the severity of the particular contact described by a particular witness. However, *if the elements of escalation and existence of opposing religious standards are shown in the evidence, the probative value is sufficient to overcome the possible prejudicial nature.*" (Emphasis added.)

Thus, as we understand the court's ruling, in order for the testimony to remain before the jury, the State was required to support its contentions, first, that the conduct with the models evidenced escalating sexual aggression and, second, that this activity produced internal conflict because of strict religious standards which would have required that the defendant be ostracized from the group of Christian believers. Because of the prejudicial nature of the testimony, neither would be relevant or ad-

missible evidence if the State did not support its contentions. We will review the testimony about religious beliefs later in this opinion. We turn now to a recapitulation of the testimony about or from the models.

We begin by noting that we will discuss the models' testimony in the order in which each was initially hired or seen by the defendant, *not* in the order in which the State had the models testify. We further note that, as the trial court itself ruled, we will review the testimony for an indication of "escalation of sexual aggression."

Diana Payne, although the fourth model to testify, was the first model to work for Hendricks. Payne first met with Hendricks sometime during April 1981. Her fitting session lasted approximately one hour; during this time she wore her bra and panties for part of the session and removed her bra for another portion. Hendricks measured her with a tape measure while she was wearing a bra, but had her remove her bra for additional measurements and while he was preparing a plaster cast of her midriff section. To make the plaster cast, Hendricks applied Vaseline from just underneath Payne's breasts to just below the panty line, applied the plaster material, and waited for the material to harden for removal. Payne wore only her panties during this process.

Cindy Baird Segabiano testified sixth but was the second model to work with the defendant. She worked with Hendricks sometime during the spring of 1981. Her measuring session lasted approximately 1 hour and 15 minutes. During this time she was measured first while wearing a leotard and tights and subsequently wearing her bra and panties with a hospital or doctor's type gown over her. While she was clothed in her bra and panties, Hendricks took measurements and made pen markings on her body with a pen. He additionally made a plaster cast of one of her legs.

Echo Renee Wulf Atwell modeled for Hendricks sometime during the summer of 1981. Although the prosecution had Atwell testify first, she was the third model to work for Hendricks. During her sessions with Hendricks she wore a leotard and tights at all times.

Dawn Rueger worked with Hendricks sometime around February or early March 1982. Although the prosecution put Rueger on the stand second, she was the fourth model to see Hendricks. During her fitting session, which lasted about 45 minutes, she wore her bra, panties and a robe. Hendricks made various marks on her body with a pen during this measuring session, just as he had done with the second model he had worked with.

Kathy Harper was the fifth model to testify in court and was the fifth model to work for the defendant. (Although she testified she worked with defendant in March 1981, it appears from other evidence in the record that she actually worked with defendant sometime in March 1982.) During an approximately 40-minute fitting session, Harper was clothed in a bra, panties, nylons, and slacks. She removed her blouse and unzipped her slacks to facilitate the fitting; Hendricks made numerous marks on her body with a pen before he adjusted the brace to fit her properly.

Hendricks apparently did not utilize the services of models for approximately a year. A year after Harper worked for him, Hendricks talked with Carolyn Johnston. Although Carolyn Johnston was the last model to testify for the prosecution, she was the sixth model contacted by Hendricks. She lived near the CASH Manufacturing office and Hendricks talked to her one day in March 1983 when she was outside attempting to jump start her car. Johnston was fully clothed at the time she spoke with Hendricks. She testified that Hendricks asked her to model in the nude, but that she asked if she

could wear panties. He indicated that this would be acceptable and she said she would think about it. Johnston later called Hendricks' office and indicated that she was too busy with her classes to model at this time. Hendricks testified at trial that he had only asked Johnston to model nude from the waist up. In any event, Johnston did not model for Hendricks.

Nancy Jarrett, a free-lance model, worked for Hendricks sometime during the early summer of 1983. The fitting session was conducted by agreement at Jarrett's apartment one evening after she returned from biking. Hendricks had been just leaving the apartment building where he had gone to meet her when she returned and indicated that she would do the fitting session at that time. She was the seventh model approached by Hendricks and she was the seventh of the models to testify for the prosecution. When Jarrett came in from her biking excursion, she was wearing what she called a legatard and panties. She did not wear a bra. Hendricks told Jarrett that he needed to make some marks on her body while he was doing the measuring, so Jarrett simply pulled the legatard down to her waist. Jarrett, a 5 foot 11 inch woman, also did a photo shoot at a professional photography studio; she modeled the brace wearing a type of leotard, but was braless. Her hairdresser accompanied her to the studio and was present for the session. Hendricks decided not to use her photograph and Jarrett indicated that she was angry at the time because of that.

During July 1983, Hendricks spoke with Penny Peavler about doing some modeling for him. Hendricks saw Peavler walking on the sidewalk one afternoon and stopped to talk with her about doing some modeling. At the time she was wearing a swimsuit and minishorts. No arrangements were made for a specific work session; Hendricks merely gave her his business card and told

her to talk to her parents about it. Peavler was the eighth potential model contacted, but the prosecution had her testify third in the sequence of models. The court ultimately struck Peavler's testimony "in its entirety. Its prejudicial impact, although that isn't great, is considerably greater than any probative value that testimony might have. It does not contribute in any way to the State's theory of motive with regard to the models, that being an increasing severity of contact." We note at this time that it is puzzling that, when the threshold question of whether the models' testimony would be allowed to stay before the jury was dependent upon, according to the trial court's test, the prosecution's showing an increasing severity of contact, this model's testimony was stricken—it was thrown out precisely because it did not support an escalation of sexual aggression.

Lee Ann Wilmoth was the ninth model contacted by Hendricks; she testified eighth. Wilmoth first worked with Hendricks the first week in August 1983. Hendricks asked her to model wearing only her underpants; she agreed to model, but wore the bottoms of her swimsuit instead. Hendricks also told her to put her bathrobe on backwards while he measured her back and on with the opening in the front when he measured her front. During the fitting session, Hendricks marked Wilmoth's body with a pen as he had done with previous models. When the measuring and marking session ended, Wilmoth modeled a bodysuit that she owned in order to determine if it would be appropriate for the photography session. During this time, Wilmoth and Hendricks were talking and Hendricks mentioned to Wilmoth that she had a tilted pelvis; Wilmoth indicated that a physician had previously told her that information. Wilmoth then mentioned to Hendricks that she also had a rib out of place. He came over to her and, using his hand, counted

her ribs. He then asked her to lie down; she went to her bedroom to lie on the bed. Hendricks massaged her back for less than a minute, asked her to roll onto her back, and massaged her front. Wilmoth testified that she then thought that Hendricks was moving close to her and that he intended to try to kiss her. She gently pushed him back. During this time in the bedroom, Wilmoth was clothed in her bodysuit at all times. Hendricks subsequently left the apartment; Wilmoth later modeled the brace during a photograph session at a professional studio. When Hendricks arrived at the studio for the session, his son Benjamin was with him.

Susan Henry Ryburn was first contacted by a photographer friend of hers in October 1983 and asked if she would be interested in modeling for Hendricks. She assented and the photographer set up an appointment for her to meet Hendricks. She went to the CASH Manufacturing office that evening. Her husband accompanied her. Ryburn was the tenth potential model to meet Hendricks; she testified ninth. Ryburn characterized her initial contact with Hendricks as one in which "his mouth dropped open" when he opened the door and she introduced her husband. Both she and her husband were invited and went into the office, however, and talked with Hendricks for some time. During this conversation Hendricks told Ryburn that she was too tall (she was 5 feet 11 inches) to model the brace for him and showed both her and her husband how the brace would have to be extended all the way for the photograph session. Ryburn also testified that it appeared that Hendricks' hair was freshly combed and that he smelled of cologne. The State emphasized the fact that Hendricks had previously measured and photographed a model who was also 5 feet 11 inches tall and that this was obviously just a pretextual excuse based on the fact that Ryburn unexpectedly showed up with her husband. We note, however,

that testimony indicated that Hendricks did not use the photographs of the other tall model (Jarrett). Additionally, Hendricks testified that he had just showered before the meeting because he had been jogging. Susan Ryburn was not hired to model.

Later that same evening Carla Webb came to Hendricks' office to apply for a modeling position. She too had her appointment set up through a photographer. Webb's contact with Hendricks, however, spanned several weeks; her initial meeting made her the eleventh model to be fitted and measured, but because of subsequent conversations and meetings, she was the last model that Hendricks worked with in any manner. Webb was the next-to-last model to testify for the prosecution.

When Webb arrived at the CASH Manufacturing office, she testified, she was wearing a leotard, pantyhose, skirt, and shoes; she was not wearing a bra or panties. When Hendricks was prepared to do the measuring for the fitting, Webb went to the office bathroom, where she removed the leotard and put on a type of hospital or doctor's office gown which Hendricks provided. When she initially returned to the office she had the gown on with the opening to the back and she also wore her skirt, pantyhose and shoes. Hendricks made the necessary measurements and corresponding marks on Webb's back. She then returned to the bathroom, where she turned the gown around so that the opening would be in the front. Hendricks continued to measure and make marks with a pen; at one point while he was measuring, he asked her to lift her breasts so that he could measure and mark right under the breast line. At some point in this fitting session, Webb testified, Hendricks also remarked that she was amply endowed. During some of this marking, Webb testified, Hendricks' hands came into contact with the side of Webb's right breast as marks were made on her side parallel with her breasts. Webb

further testified that at a later point in the session, while she was still wearing the gown, Hendricks attempted to show her that she had a slight curvature of the spine. During this process, she testified, he pulled her towards himself, but she gently pushed him away by placing her hands on his shoulders. He apologized and she told him that it was "no big deal." When she left his office, they still made plans for an upcoming photograph session. Although Webb testified that Hendricks made statements such as "I'm a good Christian" and "My wife can't find out," Hendricks testified that he did not make those comments.

Tammy Ledbetter was the twelfth model that Hendricks employed. She testified tenth. Ledbetter and the model whose testimony will be described next were hired through an agency to model the brace at an orthotics convention in Phoenix at the end of October 1983. When Ledbetter arrived at the hotel, she testified, she was wearing a leotard, bodysuit and a bra; she was not wearing panties.

Hendricks first attempted to fit the brace over the bodysuit Ledbetter was wearing, but indicated that it did not fit properly. He asked her to remove her bodysuit so that he could make some markings for an accurate fitting. Ledbetter went to the bathroom and removed the bodysuit, returning to the room wearing her bra and leotards. She subsequently removed her bra, according to her testimony, and Hendricks took measurements and made marks with a pen on her body. Hendricks told her that her back was out of line and that it would be difficult to fit the brace. Ledbetter confirmed that she was aware that she had scoliosis, or curvature of the spine. He had her lie on the couch and he massaged her back and then her front along a line to the left of the spine for approximately two to three minutes each. She testified that, when he massaged the left front, he also mas-

saged her breast, though he did not touch the nipple of her breast. Ledbetter then put the bodysuit back on, refitted the brace, and went to the convention exhibition hall with Hendricks. She only worked the convention that morning, being replaced by Elizabeth Tomlinson for the remainder of the convention. Ledbetter's reasons for not finishing the convention assignment were disputed on cross-examination.

Elizabeth Tomlinson was the thirteenth model to work for Hendricks though she testified eleventh. She arrived at Hendricks' hotel wearing leotards, tights, and a dance skirt. She wore neither bra nor panties. Tomlinson testified that Hendricks told her to remove all of her clothing; Hendricks testified that he asked her to remove only her top. In any case, she retired to the bathroom and came out nude but wrapped in a towel. Tomlinson testified that she held the towel in front of her while Hendricks measured and marked her back and that she opened and closed the towel in front of her while measurements and marks were made on the front.

She further testified that he told her that her back was out of line and that he needed to massage it. She lay on the couch and he massaged the left side of her back for about five minutes. He then had her turn and he massaged the rib area in the front; he did not at any time touch her breasts, according to Tomlinson's testimony. She dressed in the bathroom and went to the exhibit hall with Hendricks where she modeled the brace for the remainder of the afternoon. At the end of the day she returned to the hotel room for a second fitting. She undressed for this fitting in the bathroom. Hendricks made the necessary measurements for the swivel brace when she returned to the room, and she returned to the bathroom and dressed. The fitting took approximately 20 to 30 minutes.

Tomlinson also testified that Hendricks had asked her to show his secretary and him around town. Although the secretary did not take the sightseeing trip, Tomlinson showed the sights to Hendricks. She testified that one of the sights she showed him was from a mountaintop which overlooked the city. Tomlinson admitted during cross-examination that it was very possible that she asked Hendricks to pull over and stop at the top of the mountain although she at first testified that he merely stopped of his own volition. During this stop, Hendricks leaned towards Tomlinson in an attempt to kiss her on the cheek; when she told him not to, he backed off. Hendricks acknowledged that he attempted to kiss her on the cheek, but indicated that he thought that was what Tomlinson wanted him to do. They drove back to town and attempted to find a place to eat dinner. When they discovered that the restaurant they had planned to go to was closed, Hendricks took Tomlinson home. There was conflicting testimony on what Hendricks said to Tomlinson when she left the car, but we note that mere words, without more, do not provide evidence of sexual aggression. Moreover, we note that Tomlinson was among those who testified that she was not hurt by Hendricks, that she did not fear him, and that he never restrained her or prevented her from leaving. In fact, that was the unanimous testimony of all the models, save Ledbetter, who testified that she felt threatened by the fact that Hendricks "wanted [her] to come back [to work] the next day."

The last model with whom Hendricks worked prior to the death of his family was Carla Webb, whom we discussed above relative to her first contact with Hendricks. Following the orthotics convention, Hendricks returned to Bloomington; early in November Webb and Hendricks talked on three separate occasions about an upcoming photo session which Webb was going

to do. The scheduled date of November 12 was not kept due to the death of the Hendricks family. Webb was fully clothed on all three occasions.

Having put the models' testimony into the proper time sequence, we now are in a position to apply the test established by the trial court. While we note that the State presented the witnesses in an order that began with a model who was clothed in leotard and tights and ended with a model whom Hendricks allegedly asked to work in the nude, that order in no way conformed to the time frame in which Hendricks worked with them. The prosecution began with the third witness in time and ended with the sixth. Once in order according to time of contact, the "escalation of sexual aggression" is not as clear as the State claimed.

Admittance of the models' testimony was premised on a showing of "escalation of sexual aggression" on the part of Hendricks. While it is true that the next-to-last model (Tomlinson) was nude during her fitting for the brace, there is no clear testimony that she was required to be totally nude rather than merely nude from the waist up, as the previous models had been. Moreover, we note that during the time that she was nude, Hendricks made no sexual overtures towards her and, by her own testimony, Tomlinson used a towel to cover herself during the measuring process. Yet we note that Payne, seen more than two years before Tomlinson, worked with Hendricks while she was clothed in only her panties and that she was rubbed with Vaseline and covered with plaster and remained in that state of undress while the plaster hardened.

Although the trial court held that the State had made a *prima facie* case for escalation, nothing in the record indicates that the court considered the witnesses' testimony in their true order of contact with the defendant, rather than in the order in which the prosecution pre-

sented them. While the State represented to the court that it would show the "escalation" from the fully clothed to the fully nude, from no touching to fondling in a sexual manner (which it then attempted to support by the order of its presentation), we are not prepared to support the trial court's finding which allowed the testimony to remain before the jury based on the State's ordering of the witnesses.

The mere fact that Hendricks worked with models who were seen in various stages of undress, without more, does not give rise to an "escalation of sexual aggression." Evidence may not be manipulated to support a theory. When the models' testimony is considered in its proper order, it presents no more than a haphazard series of encounters, isolated instances of what could be labeled by some as sexual attraction or clumsy attempts with adolescent urges. In this context we are not prepared to find that the prejudicial impact of the testimony is outweighed by its probative value.

It is well established that a defendant's prior misconduct is not admissible for the purpose of establishing his bad character or propensity to commit illegal or immoral acts, because the prejudicial impact of such evidence outstrips its negligible probative value. (*People v. Haas* (1920), 293 Ill. 274.) "The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." (*Michelson v. United States* (1948), 335 U.S. 469, 475-76, 93 L. Ed. 168, 174, 69 S. Ct. 213, 218; see also *People v. Romero* (1977), 66 Ill. 2d 325; 1A J. Wigmore, Evidence §194 (3d ed. 1940).) Evidence of uncharged misconduct by the defendant undermines the presumption of innocence. *Government of the Virgin Islands v. Toto* (3d Cir. 1976), 529 F.2d 278, 283; see H.

Kalven & H. Zeisel, The American Jury 381-82 (1966) (in a close case, defendant's loose morals reflected in collateral conduct may prejudice jury against him).

Equally as well established as the general rule of inadmissibility, however, is the exception that prosecutors may present evidence probative of motive, intent, identity, absence of mistake or other material facts in issue even though such evidence discloses prior instances of uncharged misconduct by the defendant. (*People v. Foster* (1979), 76 Ill. 2d 365, 374; *People v. McDonald* (1975), 62 Ill. 2d 448, 455.) Motive, although not an element of murder, may be a material factor at issue in establishing guilt, particularly when the only evidence is circumstantial. (*People v. Weaver* (1982), 92 Ill. 2d 545; *People v. Holtz* (1920), 294 Ill. 143.) Thus, in some circumstances it is possible for the State to offer evidence tending to establish a defendant's motivation even though it involves the potential of disclosing a defendant's prior immoral or improper conduct.

The State's reliance on *People v. Stewart* (1984), 105 Ill. 2d 22, for the proposition that evidence is admissible which even to a "slight degree" (105 Ill. 2d at 56) establishes the existence of a motive is here misplaced. Although in *Stewart* the defendant had also been charged with murder, the victim in that case had been responsible for turning the defendant over to police approximately 10 years earlier for a prior crime. The testimony that was allowed tended to show that defendant still harbored ill will for those actions—in other words, he still held a grudge against the victim. There was a direct link between the proffered testimony and the motive for the murder in *Stewart*.

In the case before us there is no *direct* link, as even the State acknowledged during the trial. The models' testimony is only relevant when put in conjunction with other testimony about religious beliefs and a change in

appearance. Mere encounters with the models were not in and of themselves a reason for the murder of Susan, Rebekah, Grace or Benjamin.

The pursuit of justice has not permitted, and must not now permit, a man to be convicted based on an image created of him in the courtroom based on the idiosyncrasies of his past life. As Chief Judge Cardozo once observed: "In a very real sense a defendant starts his life afresh when he stands before a jury." (*People v. Zackowitz* (1930), 254 N.Y. 192, 197, 172 N.E. 466, 468.) While, as we noted above, there are certain times when evidence of prior conduct is relevant, this case does not present such a scenario. The trial court set a criterion for admissibility of the admittedly prejudicial evidence following lengthy consideration of defense motions. We do not find that the criterion for admissibility was erroneous, but that, once established, the criterion was not properly applied. Based on the State's failure to prove "escalation of sexual aggression," as detailed above, the testimony of the models should have been stricken and the jury instructed to disregard it. Information about or from the models was, according to another reference in the State's brief, "relevant to prove defendant's pattern of sexual aggression." That the *pattern of escalation* was central to the prosecution's case was noted by the prosecution in its brief before this court:

> "This is a case in which the defendant's motive could not be established without presenting a large number of models to demonstrate that the defendant had not engaged in isolated indiscretions but was engaged in a *pattern of behavior which became increasingly aggressive and overt*. Proof of the defendant's conduct with only a few of the models would have been insufficient to establish this pattern but would only have proved isolated incidents which would not have tended to explain defendant's conduct in murdering his family." (Emphasis added.)

The prosecution is correct in this point; isolated incidents could not explain the murder of defendant's family.

The prosecution simply did not prove the claimed escalation of sexual aggression. Moreover, our review of the record (and it is an extensive record, spanning some 89 volumes) suggests that the prosecution's purpose in presenting the testimony about the models was aimed at inflaming the jury's passions against the defendant. While posturing throughout the trial the necessity of the testimony to show motive, in closing arguments the prosecutor utilized this *limited-use* motive evidence to portray the defendant as having an evil disposition and to indicate that the models were victims:

> "What he did with [the model] is downright disgusting. He took that poor nineteen year old girl, took her there after she came not expecting any type of nudity at all, and convinced her that that was necessary and had her strip off and parade around with her arms out, either in front or at the side, so her breasts are sticking out. He had her lie down on her front and back while he made dots and dashes around her spine and down the middle of her chest, and pushed her body around so he could see the dots line up and then go back again, for forty-five minutes or an hour, while she thought that she was doing something that was necessary, and she left that session feeling as dirty, as humiliated as a victim would who's been victimized by a man who's been deceiving her and taking advantage of her for sexual purposes ∗∗∗."

This statement indicates not only the actual use to which the so-called motive evidence had been put—to establish defendant's character as perverted and evil—but also the extent to which proof of such collateral misconduct in reality confused the ultimate issue: Was the defendant guilty of murdering his family? Hendricks was on trial for the murder of his wife and children, not for a crime against any of the models.

Based on our analysis, it would appear that once the testimony of the models is stricken, any testimony about the defendant's religious beliefs and background is also irrelevant and highly prejudicial. As noted above, the trial court allowed the motive evidence to be admitted based on a presumption that both the testimony about the conduct with the models and the testimony about the strict religious standards were necessary, and that the alleged motive could be shown only upon a showing of a conflict between the conduct and the religious standards.

The court considered defendant's motion *in limine* to preclude testimony about the religious practices and beliefs of the group of Christian believers to which the defendant belonged. This was, the court indicated, the second of the two prongs that the prosecution needed to connect up the so-called motive evidence. In ruling on the defendant's motion, the court concluded that "evidence which tends to demonstrate a conflict between the defendant's alleged increasing severity of increasing sexual contact and his real or apparent religious beliefs or standards will be considered as generally relevant to the issue of motive." The court limited the topics that could be addressed under the motive theory, however, to questions concerning "marriage and divorce, and adultery," but also concluded that it was "not finally ruling on whether that is admissible." While, as we noted, the testimony on the defendant's religion should have been stricken based on its ultimate connection to the prejudicial and irrelevant model testimony, we also find that as an individual item of the two-prong, or two-phase, test established by the trial court, it should have been stricken for failure to make the *prima facie* showing alleged by the prosecution.

Although the prosecution argued that its evidence would show that it was not "a practical or viable option for the defendant to consider divorce as a way out of

this particular marriage," and that "in the context of the life of this defendant, that religion has played an important role in his life and that the prospect of public exposure and the sanctions that could occur within his religious group, if his behavior with the models was to become known either through his wife or through other means, can provide a motivation for the slaying of his wife and children," all that was shown was that, depending on the circumstances, a range of potential sanctions was possible. Yet, philosophically speaking, a range of consequences or sanctions will result from any action or activity in which one engages. This is true no matter what religious tenets one believes or does not believe.

Testimony from Lawrence Macy, during both direct examination and cross-examination, shows that, when one is suspected of certain transgressions, it is the practice of this Christian group to begin by talking privately with the individual who is charged with any type of so-called immorality or impropriety. The primary goal is always to return the transgressor to the "right walk." In many cases no further action is required.

Macy further testified that a range of sanctions is available when the "transgressions" continue beyond a private rebuke and may involve, depending on the circumstances, a public rebuke, a silencing, or being "set aside." The last two sanctions do not preclude the individual from meeting with the other believers but will prevent that person from speaking and selecting hymns or prayers at gatherings or meetings of prayer or will prevent that person from taking the bread and wine at meetings or joining in social functions. Even an individual who has been set aside is not precluded from attending Bible study or prayer meetings. Moreover, one who has been set aside based even on a confirmed case of adultery will not necessarily be permanently barred from partaking in full fellowship with the believers.

While the testimony about this religious group does indicate that divorce is apparently only sanctioned when there is an actual showing of adultery, that sexual promiscuity is denounced, and that marriage is valued, there was not a showing that the *only* option open when one violates these standards is to be completely ostracized from the group or that this was a sanction Hendricks feared. Rather, as Macy testified, "a restriction upon religious or prayer or social functions [does not mean] that a person would be removed from contact with their relatives or with their friends." Moreover, as the following excerpt from the transcript of the trial indicates, the welfare of the individual is at the core of the group's dealing with an individual:

"Q. When somebody is set aside, as far as your faith is concerned, does that have to do with the act of the person or the attitude of the person?

A. Well, I think there's some of both.

Q. Tell me what you mean by that.

A. Well, there is the overt act that has to be dealt with. It's as if our children did something naughty and we had to spank them. It's done in love. It's not done with malice in our hearts. We want to bring that person back into—for one thing, the very first thing that we have to remember is that that person is responsible to God for his actions. We have to bring that before him very forcibly and then in love seek to restore him to bring him back into fellowship.

Q. My next question would be then, as far as the notion of setting someone aside, when someone is set aside, are they removed, are they excommunicated, are they kicked out of the fellowship? Or what is the manner and purpose of the concept of being set aside?

A. Being set aside, they're not removed, not kicked out. They're told by a letter that they are no longer in fellowship. They're encouraged to come—to continue to come out to meetings. They're told of our love to them and our desire to have them restored. And we want them

to continue in that light, that there should be some repentance shown by that one, and if he continues in that way, then certainly—and requests again after a period of time to be brought into fellowship again, we in most cases—they can be restored.

Q. Okay. And when you use the term, restored, are you referring to a return to the use of the emblems [bread and wine] and a return to the Lord's table and a return to fellowship?

A. Absolutely.

Q. And is that in fact the purpose of the notion of being set aside?

A. Yes, it is."

This testimony, which was uncontroverted, utterly fails to show that Hendricks would have had to fear being ostracized. That that is not the case is further supported when, in reading the record, one can discover that one of the witnesses to testify about Susan's presence at the baby shower was herself a member of this Christian group and that she had years earlier given birth to a child out of wedlock and was raising the child on her own. She was active in prayer meetings and social gatherings.

Additionally, it was uncontroverted that any sanction in the areas of "adultery and unfaithfulness and illicit affairs" would only be undertaken based on a showing of "strictly *** carnal knowledge. *** We can't judge what's going on in the mind." Thus, we do not find that the prosecution has shown that Hendricks' only option was to murder his family in order to maintain his place within the community.

We are not unaware of the fact that the trial court spent untold hours listening to and reviewing motions to preclude and/or strike all of the evidence which falls under the heading of motive evidence and that each motion was conscientiously ruled on. That, however, does not lessen this court's duty to review the evidence. While we

do not rule herein on whether such testimony can ever be utilized to show motive, we do not, indeed cannot, find that the prosecution could have shown motive with the evidence presented in this case. The mere presence of a range of sanction alternatives available to this religious group to apply when a member transgresses, even when one of the most severe sanctions is to be ostracized, does not provide an indication that the defendant feared being ostracized.

As we discussed above following the review of the models' testimony, evidence which supports a theory of motive may be introduced, though it might not be admitted for other reasons. (See *People v. Foster* (1979), 76 Ill. 2d 365, 374.) Our review of the case law found no case which introduced evidence of a defendant's religion in quite the same way as occurred here. We note that the trial court and both the prosecution and defense attorneys noted the same lack of authority on point. This evidence is unlike any "uncharged conduct" information which gives rise to a motive to harm, so a comparison to such cases is not necessarily helpful. The State's theory is that the defendant would benefit by his family's death: Hendricks would be rid of his wife and yet could continue as a full member in his religious group.

One area where this court has allowed evidence to support the State's theory of motive has been when the defendant would have profited from an insurance policy on the victim's life. While it is patently obvious that insurance policies are vastly different from a religious group's beliefs, in the case before us the State argued in essence that the defendant sought to achieve the benefits of his continued membership in the religious group by murdering his wife. The State argued that only by getting rid of his wife could he continue as a member of his group rather than being thrown out. Merely pointing

to some perceived benefit, without verification that there is such a benefit in reality, does not suffice.

In *People v. Mitchell* (1984), 105 Ill. 2d 1, this court discussed the proof necessary to allow evidence of an insurance policy before the jury as indicative of motive: the defendant had to have specific knowledge of the policy, had to know that it was valid, and had to know of and want the benefit to be derived from the victim's death. Mere presence of an insurance policy, without the defendant's knowledge of singular benefit to him or without verification that he sought such benefit, will not be enough to allow the information before the jury. In *Mitchell*, this court noted that the State failed to prove that the defendant knew of the policy or of his interest in it since there was no proof that the policy was in force and there was no evidence that the policy played any role in the defendant's actions. 105 Ill. 2d at 11.

Applying a somewhat similar rationale to this case would require that there be a showing of defendant's knowledge of the specific religious teaching urged as controlling by the State, that the validity of the particular teaching was applicable to the situation, and that from the victims' deaths the defendant believed that he would derive some benefit.

Here, while there is evidence that the defendant was aware of the biblical standard of marriage which was applied in his faith, there was no showing that the State's allegation about being ostracized was the sole option available, that the defendant feared being ostracized, or that the family's death would in any way benefit the defendant. In its own stead, the testimony about the religious beliefs of the defendant should have been stricken. As this court noted in *People v. Wilson* (1948), 400 Ill. 461, 481:

" 'There is in every mind, a strong tendency to weave for itself a theory out of the minute incidents surrounding a

transaction, itself shrouded in some mystery, and to bend everything to its support.' In the instant case the absence of many essential elements of proof depending upon inference from other supposed facts, not fully proved, * * * have caused us to have a reasonable doubt that the defendant has been proved guilty by evidence, and in the manner provided by law." *Wilson,* 400 Ill. at 481, quoting *Jumpertz v. People* (1859), 21 Ill. 461, 523.

We turn now to consider the defendant's arguments which address the sufficiency of the evidence against him. This court has long held that it is the function of the jury to determine the accused's guilt or innocence; "we will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the accused's guilt. [Citations.]" *(People v. McDonald* (1975), 62 Ill. 2d 448, 456.) When faced with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. *(People v. Collins* (1985), 106 Ill. 2d 237, 261.) Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *(Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Moreover, "upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

The defendant argues that the evidence is insufficient to support his convictions because he was, in substance, "acquitted" by the trial judge. The defendant bases his argument upon the following statement which was contained in the trial court judge's sentencing order:

"I personally believe that the defendant probably did commit these offenses and I must emphasize that I intend

no criticism of the jury or its verdict by this sentencing order. Based on the *evidence* admitted on trial against the defendant I am not *personally* convinced that he has been proven guilty beyond a reasonable doubt. Some might say this is a distinction without a difference however I feel the very fabric of our justice system depends on this distinction. If the sentence issue were anything other than the most severe and irreversible sanction of death I would disregard my own concern over the level of proof and render sentence based on the verdicts as I have done many times before in other cases. However, as to the sanction of death I hold the same position as do some or perhaps even all of the jurors. I cannot in good conscience apply the sanction of death unless *I* have been convinced of his guilt beyond a reasonable doubt. I have not and mere belief is not enough." (Emphasis in original.)

According to the defendant, these statements indicate that the trial judge should have directed a verdict for the defendant. We do not agree.

The standard to be used in deciding whether to direct a verdict is "whether a reasonable mind could fairly conclude the guilt of the accused beyond reasonable doubt, considering the evidence most strongly in the People's favor." (*People v. Withers* (1981), 87 Ill. 2d 224, 230.) Applying this standard, the trial judge denied the defendant's motion to dismiss, finding "that the totality of the evidence was legally sufficient to reach the jury." The trial judge's statement that he, personally, would have acquitted the defendant is immaterial so long as the evidence was sufficient to prove guilt beyond a reasonable doubt. Therefore, the question we must decide is whether the evidence in this case, absent the improper motive evidence, was sufficient to support defendant's convictions.

In assessing the defendant's claim, we must (as the trial judge did in deciding whether to direct the verdict)

review the evidence in this case in the light most favorable to the State. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) The State introduced evidence from two forensic experts who, based upon an analysis of the stomach contents of the children, concluded that the children had been killed sometime between 8:30 p.m. and 11:30 p.m. The State also introduced evidence indicating that the defendant left his house sometime after midnight. Finally, the State presented evidence that, two days after the murders occurred, the defendant told a reporter that "[the police] said that some things [*sic*] looked like some things were taken [from his house after the murders]." The police officers investigating the murders, however, testified that though it is true that the house looked as if it had been burglarized, no one had informed the defendant of this fact.

The defendant presented his own forensic experts who disagreed with the State's experts concerning the children's time of death. He also introduced evidence that suggested that he had left his house much earlier than midnight. Finally, the defendant established that though he had never been directly told that the house had been burglarized, one of the investigating officers had asked him before his interview whether there was anything of value that could have been taken from the home.

In sum, the evidence is conflicting. The State's evidence suggests that the defendant was at the house at the time of the murders. It also suggests that the defendant had knowledge of facts (*i.e.,* the apparent burglary) which he could not have known unless he committed the crimes. Such evidence supports the defendant's convictions. The defendant's rebuttal evidence, on the other hand, suggests that the defendant was not at his house when the murders were committed, and that the defendant knew that his home had apparently been burglarized based upon a

question asked of him by an investigating officer.

Although the evidence in this case is very close, we conclude that it is sufficient to support defendant's conviction. The question of the defendant's guilt or innocence turns upon the weight and credibility which should be given the State's witnesses. Such evidentiary determinations are not for this court to make. Instead, it is the jury's responsibility "to resolve factual disputes, assess the credibility of the witnesses, and determine the weight and sufficiency of the evidence." (*People v. Yates* (1983), 98 Ill. 2d 502, 518.) Assuming, as we must, that the jury believed the State's witnesses over those of the defendant, we conclude that the evidence was sufficient to support the convictions. We therefore must remand the cause to the trial court for retrial.

For the foregoing reasons, the defendant's convictions are reversed and the cause is remanded to the circuit court of McLean County for a new trial in accordance with this opinion.

*Reversed and remanded.*

JUSTICE MILLER took no part in the consideration or decision of this case.