(No. 71320.

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HOWARD WILEY, Appellant.

*Opinion filed March 30, 1995.—Rehearing denied May 30, 1995.*

HARRISON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

A jury in the circuit court of Cook County found defendant, Howard Wiley, guilty of murder and armed robbery. The trial court, sitting as finder of fact, determined that there were no mitigating factors sufficient to preclude imposition of a sentence of death and imposed the death penalty. Judgment was stayed pend-

ing direct appeal to this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a)). Upon review, we found that defendant was entitled to a hearing with respect to his claim that the State had used peremptory challenges in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. (See *People v. Wiley* (1993), 156 Ill. 2d 464.) As a result, we remanded the cause to the circuit court with directions to conduct further proceedings under *Batson.*

The trial court held a *Batson* hearing as instructed by this court. Based upon the evidence presented at the hearing, the trial court concluded that the State had not violated the principles enunciated in *Batson*. The cause has now returned to this court for review of the trial court's *Batson* findings, as well as the additional issues raised by defendant prior to the *Batson* remand.

## BACKGROUND

As we noted in our initial consideration of defendant's appeal in this cause, defendant was found guilty of the murder and armed robbery of Donna Rucks (Rucks), her daughter Carla Williams (Williams), who lived with her in an apartment in the City of Chicago, and Rucks' sister, Adrienne Parham (Parham). According to evidence presented at trial, the offenses were committed in Rucks' apartment on approximately December 2, 1986. In addition, State evidence demonstrated that all of the women died from gunshot wounds to the head. Their bodies were discovered on December 3, 1986, by employees of the building management where the apartment was located. Officers of the Chicago police department were summoned to the scene.

Detective Richard Rochowicz of the Chicago police department testified that on December 3, he and his partner, Richard Vallandingham, arrived at the apartment at approximately 10:40 a.m. Thereafter, Detectives Thomas Ptak and William Foley also arrived at

the apartment. The telephone rang while the officers were there and Detective Foley answered. After this phone conversation, Detectives Ptak and Foley went to the home of defendant's father, where they met the defendant. The detectives told defendant that they were investigating the death of Donna Rucks.

Detective Ptak testified that defendant stated that he was an acquaintance of Rucks, that he was concerned about her, and that he would be happy to help in the investigation. Defendant agreed to accompany the detectives to a nearby police station. While defendant was at the station house, he acknowledged to Detective Ptak that he had been at the women's apartment the previous day. Defendant explained that he had been "concerned" because no one answered his knocks on the door of the apartment. Defendant said that he called the police, but that the officers who responded to his call refused to break into the apartment because it looked secure from the outside.

Defendant also informed Detective Ptak that defendant had spoken to a parole officer. Detective Ptak consulted with this parole officer and then resumed his interview with the defendant. Defendant waived his *Miranda* rights at this interview and stated that he had gone to the women's apartment on December 2 and knocked on the door. Defendant related that his knocking caused the door to swing open and that he entered the apartment. Defendant stated that he found the dead bodies of Rucks, Parham, and Williams in the apartment. The locations of the bodies and the condition of the apartment as recounted by the defendant corresponded to the scene as it had appeared to Detective Ptak. Defendant stated that he left the apartment, closing the door behind him, realizing that as he did so the door would lock. Defendant explained that he had not told the police what he had discovered because he was

afraid that someone would "pin" the deaths on him because he was on parole. When Detective Ptak told defendant that one of the victims had been raped, defendant disagreed, telling Detective Ptak that he "kn[e]w" that victim had not been raped. Following these remarks, defendant was placed under arrest for the murder of the three women.

The following day, Detective Ptak learned that defendant might have fired a weapon, a few days earlier, at a store in a neighborhood near the apartment where the women had been murdered. The detective went to the store and recovered a bullet that was embedded in a cooler. Detective Ptak was told that defendant had fired the shot into the cooler. The officer returned to the police station and submitted the bullet he had recovered from the cooler for ballistics studies.

Thereafter, Detectives Rochowicz and Vallandingham advised defendant of his *Miranda* rights and informed defendant that the bullet from the cooler matched those recovered from the bodies of the dead women. Defendant then agreed to give an account of what had actually taken place.

Defendant told the officers that on December 2, he telephoned one of the slain women, Carla Williams, who was "holding" $5,000 for him. Defendant told Williams that he wanted the money, but she said she did not have it and that he would have to wait for it. Defendant became angry that Williams refused to return his money. He went to a pool hall where he met Eddie Jones, whom he also knew by the name of Charles Battles. In talking to Battles, defendant offered to pay $1,500 to Battles if he would help defendant recover his money from Williams. Battles agreed and they drove to the women's apartment. Defendant gave Battles a .38 revolver that defendant had with him.

When they arrived at Rucks' apartment, defendant knocked on the door and was allowed to enter. He left the door open slightly so that Battles could get into the home. According to defendant, Battles came into the apartment and announced a "stickup." One of the women, Rucks, jumped up from the couch. Her movements startled Battles and he shot her. Then Parham, one of the other murdered women, started to run away. Battles shot her also. The third woman, Williams, came down the steps from the upstairs bedroom. When Williams saw what had happened, she started to run back up the stairs. Battles pursued and shot her. Defendant related to the detectives that Battles then said to defendant that he "better be with" Battles, and defendant agreed that he was "with" Battles. Defendant then left the apartment, while Battles remained.

After giving this verbal account to the detectives, defendant gave oral and written statements to Assistant State's Attorney Michael Gerber. These later statements were substantially similar to the account defendant gave to Detective Rochowicz.

Tests performed by evidence technicians established that the bullet recovered from the cooler had been fired from the same weapon used to shoot the three women in the December 2 homicides. A firearms examiner employed by the Chicago police department, Detective Richard Chenow, testified at defendant's trial regarding the specific characteristics of the bullets that linked those fired into the women to the shot fired into the cooler. Two eyewitnesses, Robert Jackson and Nigem Abder, testified that on November 26, 1985, they saw defendant shoot a weapon in the store, and that the bullet fired from the gun struck and became embedded in a cooler.

At the close of the State's case, the trial court denied defendant's motion for a directed verdict. Defendant presented no evidence in his own behalf. Following

deliberations, the jury found defendant guilty of three counts of murder and three counts of armed robbery. After sentencing hearings, defendant was sentenced to death on the murder convictions and consecutive 30-year sentences for the armed robbery convictions.

Additional evidence and matters of record are set out below with respect to the issues upon which they bear significance.

## *BATSON* ISSUE

In his initial appeal, defendant argued that the trial court erred when it denied his motion for a mistrial based on the State's alleged discriminatory use of peremptory challenges during jury selection in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

In *Batson*, the United States Supreme Court held that the prosecution cannot employ a peremptory challenge in order to exclude a prospective juror because of race. When a defendant claims that the State has engaged in improper use of peremptory challenges in violation of *Batson*, the defendant must first make out a *prima facie* case of discrimination. In a *prima facie* case, the facts and circumstances must raise, "from all the surrounding circumstances, a reasonable inference that the prosecutor exercised peremptory challenges to exclude prospective jurors because of their race. [Citations]." (*Wiley*, 156 Ill. 2d at 473.) Once it is determined that the defendant has made out a *prima facie* case of discrimination with respect to the prosecution's peremptory challenge of particular jurors, the burden shifts to the State to come forward with race-neutral reasons for its peremptory challenges of those jurors. The trial court must then decide if the defendant has demonstrated that the prosecutor engaged in purposeful discrimination in seeking to exclude the jurors. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24; *People*

*v. Mitchell* (1992), 152 Ill. 2d 274, 288; see also *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419; *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.

In defendant's initial appeal to this court, we determined that the defendant had made out a *prima facie* case in which the State's use of peremptory challenges with regard to five prospective jurors had violated the directives of *Batson*. We remanded the cause for further proceedings to enable the State to provide reasons for its peremptory challenges of these jurors. (See *Wiley*, 156 Ill. 2d at 476-77.) The trial court's *Batson* hearing focused on the State's use of peremptory challenges with respect to prospective jurors Willie Smith, Lawrence Towns, Lavita Bluit, Eugene Weatherall, and Silas Gilty.

Before the prosecution explained its precise reasons for exercising peremptory challenges against these jurors, the assistant State's Attorneys explained to the trial court that they had approached jury selection with a "wish list" of those characteristics they were hoping to find in persons selected to serve on the jury. These characteristics included the ability to be fair, honest, sober, cogent, patient, attentive, detail-oriented, and analytical. After detailing the characteristics contained in their "wish list," the prosecutors gave their reasons for challenging the prospective jurors. Following briefing and argument, the trial court determined that the State had not exercised its peremptory challenges in order to exclude the prospective jurors for racially discriminatory reasons. Defendant disputes this determination.

Initially defendant claims that the assistant State's Attorneys' explanation of the "wish list" of characteristics for which they were searching was nothing more than a pretext for racial discrimination. The defendant points out that a number of jurors were not excused by

the State even though they did not possess all of the features or traits set out in the prosecution's "wish list." On this basis, the defendant asserts that the State's reasons for excluding the prospective jurors were a pretext for racial discrimination. We disagree. The circumstance that the State accepted some jurors who did not possess all of the ideal attributes sought by the prosecutors does not establish that the prosecution engaged in racial discrimination in its use of peremptory challenges, nor does it demonstrate that the reasons given by the prosecutors were a pretext for discrimination. See *People v. Kitchen* (1994), 159 Ill. 2d 1, 21.

Defendant further asserts that the State's reasons were inadequate because the prosecution explained that its "wish list" of characteristics was based on certain assumptions about the nature and complexity of the evidence to be presented at the defendant's trial. Although the State's expressed concerns may have been overstated, the circumstance that the defendant's trial was not as long as the State had anticipated does not tend to the conclusion that the State's use of peremptory challenges violated the requirements of *Batson*. Similarly, whether the prosecutors were accurate in their assessment of the complexity of the evidence against the defendant or the instructions that would be given to the jury does not dictate the conclusion that the prosecutors excused prospective jurors because of their racial background.

The proper focus of inquiry in this appeal is whether the reasons provided by the prosecutors with respect to the five prospective jurors were pretextual. The trial court considered the specific bases provided by the State and found them valid grounds to exclude the jurors. In reviewing the propriety of the trial court's determinations with regard to the individual jurors, it is important to bear in mind that, in general, it is the province of the

trial court to evaluate the credibility of the explanations offered by the prosecution at a *Batson* hearing, based on its observations during the course of *voir dire* and its assessment of the behavior of the prospective jurors and the prosecutors. (*People v. Ramey* (1992), 151 Ill. 2d 498, 519.) Because the trial court is in a superior position to assess and evaluate the credibility of those involved in the proceeding, a trial court's determination with respect to a defendant's *Batson* claim is entitled to great deference and will be disturbed on appeal only if manifestly erroneous. *People v. Hope* (1992), 147 Ill. 2d 315, 321 (citing *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21, and *Hernandez*, 500 U.S. at 364-65, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869).

The prosecution's reason for excluding a prospective juror must consist of more than a bald assertion of nondiscriminatory motives or good faith on the part of the prosecutor. (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24.) The State's explanation must be founded on a specific bias shown by the juror that relates to the case being tried. *People v. Andrews* (1993), 155 Ill. 2d 286, 293, citing *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.

The Supreme Court has directed that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.) A prosecutor's race-neutral reasons may include such considerations as unemployment (*Andrews*, 155 Ill. 2d at 301) or less than forthright answers to questions posed during *voir dire* (*People v. Hudson* (1993), 157 Ill. 2d 401, 430). A prosecutor's suggestion that he has challenged a prospective juror because of demeanor, although acceptable as a race-neutral explanation, must be closely scrutinized; the prosecutor's perception of a juror's body language is

subjective and may be easily used as a pretext for discrimination. (*Hudson,* 157 Ill. 2d at 433; *Ramey,* 151 Ill. 2d at 520.) However, a venire member's improper demeanor may be a legitimate basis to exercise a peremptory challenge to exclude the prospective juror.

The objective of the trial court's hearing in the case at bar was to decide whether the State had valid, race-neutral reasons for its exercise of peremptory challenges with respect to the five jurors who the defendant argued had been excluded because of their race.

### Willie Smith

At *voir dire,* Smith had testified that he had lived in the Austin neighborhood for the last 10 years and that he had worked for the same company for the previous 11 years. Smith stated that his wife also worked, that he rented his home, and that he had two children, aged 27 and 25. Smith had never previously served on a jury.

At the *Batson* hearing, the prosecutors stated that they believed Smith would not be a serious juror because he had left unanswered six questions on his jury card. The trial court agreed that this was "an unusually high number, which the [p]rosecutor believed indicated an inability to follow instructions, lack of interest, and [in]attention to detail." The court determined that "these reasons cited by the [p]rosecutor are race neutral."

The trial court was correct to conclude that Smith's failure to answer questions on the jury card was a race-neutral reason for the prosecution's decision to exclude him from service. The record reflects that on his juror card, Smith did not state his age, his wife's occupation, or his wife's employer. Smith also did not reveal how many children he had or their ages. Importantly, Smith did not state whether he had ever served on a jury.

Particularly in view of the number of answers which Smith did not provide on his juror card, and in light of the importance of this information to an assessment of

whether he should serve on a jury, it was reasonable for the State and the trial court to believe that Smith was not sufficiently detail-oriented. Smith's failure to answer several questions posed on the juror card reflected adversely on his competence to serve on the jury. (*People v. Baisten* (1990), 203 Ill. App. 3d 64, 79.) We find no manifest error in the trial court's conclusion with respect to this juror.

The defendant argues that the reason provided by the State was pretextual. The defendant claims that Smith "may have had some reason for not completing the jury card." We disagree. We discern no sound reason from the record for this prospective juror's failure to answer the questions asked on the juror card.

The defendant also suggests that, if the prosecution believed that the inadequacies of the juror card were significant, the State should have asked supplemental questions of Smith with respect to those questions left unanswered. The State's failure to pose additional questions does not lead to the conclusion that the reasons given by the State were a mere pretext for racial discrimination. *Kitchen,* 159 Ill. 2d at 20-21.

The defendant further notes that Smith provided all of the information requested of him during *voir dire.* The defendant's assertion lacks merit, however. Smith's failure to provide the required information on his juror card is equally as telling and significant as the nature of the information which he gave the court during *voir dire.* It was not unreasonable for the State to draw an unfavorable impression of this juror based upon the extent to which he failed to provide the necessary information on his juror card.

### Lawrence Towns

During *voir dire,* Towns told the court that he had lived in the Roseland community for almost 20 years and that he worked for Sears. Towns stated that his

wife also worked and that he owned his home. He testified that he had served on a robbery jury two years earlier, but that this would not affect his ability to serve impartially. Towns also stated that someone broke into his house four years ago and stole his car, no one was apprehended, and the incident would not affect his ability to be fair and impartial.

The State explained that it excused Towns because he had recently served on a jury during a robbery trial. The prosecutors believed that it might be too difficult or confusing for Towns to serve on defendant's jury in a felony murder trial. The prosecutors also believed that Towns had not been consistent in his answers on the jury card and his responses to the court during *voir dire*. For example, Towns' jury card indicated that he was unemployed. During *voir dire*, however, Towns stated that he worked for Sears. The State also believed there was a discrepancy because Towns' jury card indicated that he had been involved in a lawsuit while he stated during *voir dire* that his brother-in-law had been involved in litigation.

The trial court accepted the prosecutor's explanations, reasoning that Towns might be confused after having served as a juror in a robbery case. The court also observed that Towns had been inconsistent in certain answers that he gave in *voir dire* as compared to the information he had provided on his juror card. The court noted that Towns "may have been unable to fully understand and follow instructions" and noted that the prosecutors believed he was "possibly confused or dishonest."

We question whether a prospective juror's past service on a jury in an armed robbery case would cause him to become confused if he were to serve on a jury in a case similar to defendant's. Under other circumstances, this basis, standing alone, may not be sufficient

to justify the prosecution's exercise of a peremptory challenge of the juror. In the present cause, however, there was another adequate basis for the prosecution to exercise a peremptory challenge against prospective juror Towns. The record indicates that Towns was inconsistent and inaccurate in certain of his representations to the trial court. We agree with the trial court that this basis, also advanced by the State, was a proper race-neutral reason for its exclusion of Towns. As the trial court correctly concluded, lack of candor in answering the court's questions during *voir dire* is a valid ground to exercise a peremptory challenge. It is also acceptable to exclude a juror who appears to be confused or unable to understand and follow the court's directives. (*People v. Fair* (1994), 159 Ill. 2d 51, 73.) The trial court's ruling with respect to prospective juror Towns was not manifestly erroneous.

### *Lavita Bluit*

During *voir dire*, Bluit advised the court that she lived on the west side of the City of Chicago and was unemployed. She stated that her hobbies were baseball, volleyball, and baby-sitting. She had never been a juror before, and stated that she could be fair and follow the law as instructed by the judge.

The prosecutors told the court at the *Batson* hearing on remand that they challenged Bluit because they feared she might not take seriously her responsibility as a juror. The State pointed out that Bluit was only 19 years old, which the prosecution believed was too young to serve on the defendant's jury in the present cause. Also, the prosecutors stated that they found Bluit to be immature. They looked disfavorably on her statement that her hobbies included baby-sitting, and believed she had been inconsistent in the answers given on her jury card.

The court agreed with the State's assessment of Bluit, offering the observation that she was the "youngest *** of those prospective jurors remaining in the venire." The trial court noted that Bluit "responded inappropriately, lacked attentive demeanor, was unemployed with no work experience and lacked technical, scientific, or detail-oriented occupational experience." Lack of maturity, inappropriate demeanor, and unemployment are all valid grounds to exercise a peremptory challenge with respect to a prospective juror. (*Kitchen*, 159 Ill. 2d at 22.) All of those attributes were present in prospective juror Bluit. The trial court's ruling was not manifestly erroneous.

### Eugene Weatherall

During *voir dire*, Weatherall gave the court information regarding his family and friends, his work history, and his residences. He also advised the court that he had served on a jury in a civil trial several years ago, but said that he believed he could be fair and impartial.

The prosecutors told the court at the *Batson* hearing that they exercised a peremptory challenge with respect to Weatherall because they believed, from his demeanor and his answers to the court's questions, that Weatherall was under the influence of alcohol. During *voir dire*, the trial court agreed that Weatherall appeared to be suffering from alcohol-related problems or a physical handicap.

At the *Batson* hearing, the court found the State's explanations race-neutral, reasoning that the prosecutor "immediately gave a race neutral reason for the exclusion of this juror, that the juror was under the influence of alcohol or other drug." The court stated that it accepted this explanation as "the race neutral reason for exclusion" and observed that the "impairment" of this juror was "obvious."

A prospective juror's affliction with a condition that renders the juror unable to be attentive during the

course of trial is an acceptable reason for excluding that juror. (See *People v. Harris* (1989), 129 Ill. 2d 123, 175.) Accordingly, the trial court's decision with respect to prospective juror Weatherall is supported in the record.

The defendant contends that the prosecutor's reasons were actually a pretext for discrimination. The defendant argues that if the prosecution had truly believed that Weatherall was "under the influence," the prosecutors could have challenged him for cause. The availability of a challenge for cause does not automatically render invalid the State's use of a peremptory challenge to exclude a prospective juror. In addition, it does not demonstrate that the prosecutor's reasons were merely a pretext to engage in unlawful discrimination during jury selection.

The defendant also suggests that it is "suspicious" that the State did not request supplemental questions to determine if Weatherall was suffering from alcohol abuse or a physical handicap, and that the absence of such supplemental questioning tends to indicate a discriminatory motive. Although the trial court initially stated that it believed Weatherall was suffering from a physical handicap, the court later indicated that it agreed with the State's assessment that Weatherall was under the influence of some substance. The trial court was in a better position than this court to evaluate the nature and extent of Weatherall's condition. The trial court judge saw Weatherall during *voir dire*, witnessed Weatherall's reactions to questions posed to him, and was able to determine Weatherall's behavior and demeanor. We cannot say that the trial court's ruling with respect to this juror was manifestly in error.

### Silas Gilty

Gilty testified that he had a cousin who was an Oak Park police officer, but that this would not affect his ability to be fair and impartial. Gilty stated that he was

24 years old, single, worked for General Electric, lived in the Austin neighborhood and rented his home.

The State advised the trial court that Gilty was challenged because he had given erroneous information on his jury card, stating on his card that he was 34, rather than 24. Also, when Gilty was asked by the court if he could be fair to both sides, he first said no. When the court repeated the question, Gilty responded that he could be fair.

The court stated that it could not determine whether Gilty said that his age was 24 or 34. However, the court found that the "[p]rosecutor *** believed that [Gilty] said [he was] 24 and that [the prosecutor] believed a discrepancy existed between *** Gilty's juror card and his *voir dire* answer." The court also found the State had a race-neutral reason to excuse Gilty because he had initially answered that he could not be fair in assessing the defendant's guilt.

We conclude that the trial court's decision with regard to this juror was not manifestly erroneous. We need not determine whether Gilty's response regarding his age was a valid basis for the prosecution's decision to exclude him. A juror's hesitancy in responding to questions about whether he would be fair and impartial is a sound and justified reason to exercise a peremptory challenge excluding that venire member from service. The trial court's ruling was not reversible error in this case.

Defendant complains that the State's reasons were pretextual because the transcript taken by the court reporter showed that Gilty correctly gave his age. However, the prosecutors stated that they thought Gilty had given an incorrect age, and the trial court accepted the prosecution's explanation. On the record before us, we find no manifest error in the court's acceptance of the State's explanation in this regard.

Defendant also suggests that the State engaged in racial discrimination in its exclusion of Gilty, because this juror stated that he could, in fact, be fair and impartial in his determination of the defendant's guilt. The defendant asserts that Gilty's original response that he could *not* be fair and impartial was given in error and was simply a mistake. Defendant contends that Gilty corrected his response, to say that he *could be* fair and impartial, once he was given an opportunity to correct his mistake.

The trial court did not agree with this assessment of Gilty's statements during *voir dire*, however. Rather, the trial court agreed with the prosecutors that Gilty had been equivocal in his representation that he could be fair and impartial. The trial court was in a better position to evaluate the testimony of this witness during *voir dire*. Upon review, we are not at liberty to engage in an independent assessment of the credibility of this juror's statements. The record does not support the defendant's argument that the trial court's decision with respect to Gilty was manifestly erroneous.

Additionally, we reject defendant's argument that the trial court's decision was in error because there were other jurors who shared the same characteristics as those cited by the State above, and who nevertheless were not challenged by the prosecution. This circumstance does not lead to the conclusion that the trial court's disposition was manifestly erroneous.

In reviewing the reasons given by the State, it is necessary to bear in mind that " 'in many instances there will be no single criterion that serves as the basis for the decision whether to excuse a particular venireman.' " (*People v. Mitchell* (1992), 152 Ill. 2d 274, 295, quoting *People v. Mack* (1989), 128 Ill. 2d 231, 239.) The State's purposeful discrimination is not automatically established by the mere coincidence that an excluded

juror shared a characteristic with a juror who was not challenged. The excluded juror may possess an additional trait that caused the State to find him unacceptable, while the juror who was not challenged may possess an additional characteristic that prompted the State to find him acceptable to serve as a juror. (*Ramey*, 151 Ill. 2d at 520.) "[A] peremptory challenge is based on a combination of traits, and a juror possessing an unfavorable trait may be accepted while another juror possessing that same negative trait, but also possessing other negative traits, may be challenged." *Mitchell*, 152 Ill. 2d at 295.

The defendant argues, in the alternative, that this court should remand the cause for another *Batson* hearing. The defendant claims that the trial court erred when it refused defendant's request that the prosecutors be ordered to give their explanations under oath and subject to cross-examination. Defendant contends that the *Batson* Court's citation to *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089, implies that once a *prima facie* showing of discrimination has been made, the State's explanations must be made under oath and subject to cross-examination.

This court has consistently rejected this argument. For example, in *People v. Young* (1989), 128 Ill. 2d 1, the court noted that the Supreme Court's decision in *Batson* merely stated that the prosecutor must "come forward with a neutral explanation for the challenge" (*Young*, 128 Ill. 2d at 25), but did not require that the prosecution's explanations be given under oath and subject to cross-examination (*Young*, 128 Ill. 2d at 24-26). Also, in *People v. Harris* (1989), 129 Ill. 2d 123, this court again rejected a defendant's argument that the State's explanations for peremptory challenges must be given under oath and subject to cross-examination. (*Harris*,

129 Ill. 2d at 174; see also *People v. Hope* (1990), 137 Ill. 2d 430, 484, *vacated on other grounds* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792.) The defendant has advanced no sound reason to justify this court's departure from our precedent on this question. Accordingly, we find no error in the trial court's refusal to grant defendant's request in this respect.

In light of the foregoing, we find defendant's *Batson* arguments an inadequate basis to disturb the trial court's judgment.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that several errors by his trial attorney deprived him of effective assistance of counsel.

Generally, an accused is entitled to capable legal representation at trial. (*People v. Odle* (1992), 151 Ill. 2d 168, 173.) Under the two-part test of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which this court adopted in *People v. Albanese* (1984), 104 Ill. 2d 504, 526, the defendant's ineffective-assistance claim is governed by the following principles:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

It is not sufficient for defendant to show that the errors of counsel might have had some effect on the trial. Rather, the defendant bears the burden of proving that, but for counsel's allegedly unprofessional errors, the outcome of the proceeding probably would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In reviewing counsel's performance, the entire record must be taken into account, and the attorney's actions viewed from the circumstances confronting counsel at the time his questioned conduct occurred. (*Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66; *People v. Wright* (1992), 149 Ill. 2d 36, 49.) There is a strong presumption that counsel's performance was effective, that the attorney made all significant decisions in the exercise of reasonable professional judgment, and that the representation defendant received fell within the broad range of proper professional assistance. (*Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.) Where it can be said that the defendant was not prejudiced, it is not necessary to decide if his counsel's performance was constitutionally defective. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Spreitzer* (1991), 143 Ill. 2d 210, 219.

Defendant first challenges his trial counsel's failure to file a motion *in limine* to prevent the State from commenting on defendant's parole status at the time of the murders. The record indicates that on two occasions during opening statements, the prosecution remarked that defendant told authorities he had found the women's bodies but that he did not report this discovery to the police because he was on parole and was afraid that he would be blamed for their deaths. Defendant's attorney objected to these comments. The trial court sustained the objections, but denied defense counsel's motion for a mistrial. In so ruling, the court suggested

that defense counsel could have filed a motion *in limine* to preclude the State from making such comments during opening statement.

We do not believe that counsel's failure to file a motion *in limine* amounted to a *Strickland* error warranting a new trial. In our view, the outcome of defendant's trial probably would not have been different if his attorney had filed a motion *in limine* that would have barred the State's remarks during opening statement. The prosecutor's comments, although erroneous, did not deprive defendant of a fair trial. The evidence against defendant was considerable, consisting of his inculpatory statements to authorities and evidence linking him to the murder weapon. Consequently, defendant's *Strickland* argument on this point is not persuasive.

Next, defendant questions his trial counsel's failure to litigate, at defendant's jury trial, the voluntariness of his statements to authorities. Defendant notes that his attorney filed a pretrial motion to suppress his statements as involuntary. The trial court denied this suppression motion following an evidentiary hearing. Defendant urges that even though the trial court refused to suppress the defendant's statements, trial counsel could and should have attempted to litigate the voluntariness issue again at trial. Defendant points out that at trial, some of the State's witnesses testified to the defendant's incriminating statements to authorities. Defendant contends that his trial counsel should have cross-examined these witnesses in order to explore the voluntariness of defendant's statements.

However, defendant fails to explain in what respects the cross-examination of these witnesses would have produced evidence tending to show that defendant's statements were involuntary. Absent a showing that the witnesses would have provided testimony to indicate that defendant's statements were not voluntary, we find no deficiency in the scope of cross-examination under-

taken by defendant's trial counsel. Also, based upon our review of the record, we conclude that his attorney engaged in cogent and probing cross-examination of these State witnesses.

Defendant further asserts that his trial counsel failed to undertake any meaningful cross-examination of Richard Chenow, the firearms witness. According to defendant, his attorney should have questioned Chenow's expertise as a firearms examiner. Defendant contends that the cross-examination of Chenow was "cursory" and that "what little cross-examination" there was by his attorney was "counterproductive." Our review of the transcript fails to reveal that counsel's cross-examination of this witness was ineffective. Defendant does not suggest in what respect he would have benefited from a more detailed cross-examination of the witness' expertise. Also, contrary to defendant's characterizations, the record does not disclose that the cross-examination of this witness was "cursory" or "counterproductive." We find no deficiency in counsel's cross-examination of this witness under *Strickland*.

Defendant also challenges his trial attorney's decision not to cross-examine the two persons who witnessed defendant's firing of a gunshot into the cooler at the store. Defendant contends that these witnesses "provided the crucial link" between himself and the weapon used to kill the three women in this case. According to defendant, the identification testimony of these two witnesses was "far more damaging than any of the other details that could have been elicited by the State concerning the incident at the store." Defendant contends that his trial attorney's decision not to question the identifications resulted in a failure to "subject one of the most crucial pieces of the State's case to adversarial testing."

The record indicates that prior to trial, defense counsel filed a motion *in limine* which sought exclusion of any evidence or testimony regarding the incident where defendant allegedly fired a shot into a store's cooler. The defendant noted that there were criminal cases pending against the defendant that charged him with attempted murder and attempted armed robbery in connection with the shooting at the store.

The State responded that witnesses to the store shooting had identified defendant in a lineup as the person who had shot a weapon at the store, thereby causing a bullet to become lodged in a cooler. The State advised the court that identification of the defendant as the person who had fired the weapon, as well as evidence that the bullet recovered at the scene matched the bullets recovered from the victims, were "essential" to prosecution of the defendant.

The trial court denied the defendant's motion *in limine*, stating that the prosecution could introduce evidence and testimony to show identification of the defendant and identification of the bullet fired into the cooler, but that the State could not offer any testimony that would indicate that a crime had been committed.

Later, during the State's case in chief, defense counsel renewed his motion to exclude the testimony of the witnesses to the shooting. Defendant's attorney noted that the trial court's ruling "basically *** puts us in a position of almost stipulating but which we are not willing to do, but we are really locked into because we are asserting our right to keep these highly prejudicial materials out and away from the Jury." Defense counsel observed, "We are giving up the right to confront witnesses against us because we can't cross-examine." The trial court responded, "These are the dilemmas you face."

Thereafter, when the State indicated that it would call the two witnesses to the shooting at the store,

defense counsel again objected to their testimony. Defense counsel noted that he would be "further prejudiced by the earlier motions which we made *in limine* whereby it would be very difficult for us to cross-examine these witnesses without opening the door to much more damaging evidence." Defense counsel advised the court that he did not "see how [we] can" cross-examine the witnesses about their identification of the defendant "without opening the door to just everything that we have excluded to this point coming in." In response to the defense attorney's remarks, the trial court suggested *inter alia* that the defense should withdraw its motion *in limine*. When defense counsel declined to do so, the court repeated its admonition to the State to the effect that the witnesses' testimony should make no reference to the defendant's alleged commission of criminal activity while he was seen shooting a gun at the store.

We believe that defense counsel's decision to restrict examination of these two witnesses was an exercise of trial strategy. As this court has emphasized, trial counsel's strategic decisions during the course of the proceeding are generally protected by a strong presumption that the attorney's decisions reflect sound trial strategy rather than incompetence. (*Ramey*, 151 Ill. 2d at 523, citing *People v. Steidl* (1991), 142 Ill. 2d 204, 240.) The Supreme Court has admonished that "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066, quoted in *People v. Hampton* (1992), 149 Ill. 2d 71, 109.

In light of the circumstances surrounding the testimony of the two witnesses with respect to their

having seen defendant shoot a gun, thereby causing a bullet to lodge in a cooler, we conclude that the defendant's trial attorney made a calculated decision to forgo testing the identification testimony of the two witnesses in order to ensure exclusion of their additional testimony that defendant was present at the store because he was attempting to commit an armed robbery. Defendant does not challenge his attorney's assumption that, if counsel had cross-examined the witnesses regarding their identification of the defendant, he would have opened the door to introduction of evidence tending to show that the defendant was attempting to rob the store at the time of the shooting. Such further testimony from these witnesses, giving additional details of the nature of defendant's presence at the store, would have been severely damaging to defendant's case. In view of all of these circumstances, we are unable to say that the defendant's attorney was ineffective in the decision he made.

Defendant also claims that his trial attorney was deficient because of certain remarks he made during closing argument. According to defendant, his counsel made comments during closing that conceded the defendant's guilt of murder.

Specifically, defendant contends that his trial counsel acknowledged his guilt when he stated that the jurors were "restricted in your deliberations to look at the four corners of the evidence, and if you look at the evidence and you decide that Howard Wiley had some involvement in this case, then it is based on accountability and not on the fact that he actually pulled the trigger." Defendant's attorney then stated, "It's as plain and simple as that, you cannot say Howard Wiley pulled the trigger in this case, there is no evidence of it, the State is not sure, no one can be sure."

We do not believe that these remarks amounted to a concession of defendant's guilt by accountability for the deaths of the three victims. The transcript indicates that defendant's trial counsel was attempting to point out to the jury that the State's case did not amount to proof beyond a reasonable doubt. In this regard, his trial attorney stated that "if" the jurors decided that defendant had "some involvement," then at most this finding could only be based upon a theory of accountability. Thus, counsel did not concede defendant's guilt. Rather, defendant's trial attorney emphasized to the jurors that the State had no direct evidence that defendant "actually pulled the trigger."

In view of these conclusions, we find no merit to defendant's additional argument that his counsel was ineffective under *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, which held that an accused is entitled to a new trial, irrespective of whether he can show prejudice, where his counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." (*Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047; see also *People v. Hattery* (1985), 109 Ill. 2d 449, 461.) The transcript of defendant's trial demonstrates that his attorney did submit the State's case to adversarial testing. The record before us does not establish that there was a "total failure" of legal representation in defendant's behalf. Consequently, his *Cronic* argument is rejected.

### EVIDENCE OF DEFENDANT'S PAROLE STATUS

Defendant urges that he should receive a new trial because one of the police officers, Detective Ptak, improperly testified at trial that defendant was on parole at the time he made his incriminating statements to the police officer.

Generally, it is improper to admit evidence that the defendant engaged in other crimes merely to prove the accused's propensity to commit criminal acts. (*People v.*

*Hendricks* (1990), 137 Ill. 2d 31, 52.) Evidence that the defendant has engaged in other criminal activity may be admissible, however, to prove identity, motive, or state of mind of the accused. See, *e.g., People v. Salazar* (1988), 126 Ill. 2d 424, 455; *People v. Richardson* (1988), 123 Ill. 2d 322, 342-43.

Defendant complains of two statements made by Detective Ptak, and contends that these references to defendant's parole status violated the trial court's ruling. As noted earlier with respect to the defendant's argument that he was deprived of the effective assistance of counsel, the record indicates that during opening statements, the prosecution remarked that defendant had advised the police that he had discovered the victims' bodies but had not reported this to the authorities because he was on parole and was afraid he would be blamed for their deaths. Defendant's attorney objected to the State's remarks. During a lengthy sidebar, the trial court denied defendant's motion for mistrial.

In order to limit further comment about defendant's parole status, the trial court ruled that the fact that defendant had talked to parole officers could be revealed to the jury, but that witnesses would not be permitted to disclose that defendant had spoken to his own parole officer. However, the trial court held admissible the defendant's statement that he had not notified the authorities after he found the women's bodies because he was on parole and was afraid he would be blamed for the murders. In this appeal, defendant does not challenge the propriety of the trial court's ruling that limited the extent to which defendant's parole status could be revealed to the jury. Instead, defendant argues that certain testimony from Detective Ptak exceeded the scope of the restrictions specified by the trial court.

During the course of the trial, Detective Ptak testified as a prosecution witness regarding the statements defendant made to authorities. Detective Ptak stated that defendant told him that defendant had discovered the bodies. The following colloquy then occurred:

"Q. [Assistant State's Attorney:] Did Howard Wiley state to you when he told you this statement that he had told that to any other persons?

A. [Detective Ptak:] He stated he had told this to his parole officer."

The defendant objected to this testimony. The trial court sustained the objection and advised the jury to disregard the last statement of the officer.

At a sidebar, defendant's attorney made a motion for a mistrial. The trial court, upon listening to a tape recording of the officer's testimony as taken by the court reporter, ruled that "[t]here is no doubt, after having listened to the tape, that the witness, Detective Ptak, started to say his, stopped in the middle of the word his and changed it to a." The court further explained that it "rule[d] that the police officer inadvertently started to say the word his, changed it in mid-word to a, and that it was totally inadvertent and understandably beginning of a mistake and a prompt correction by the officer." The court noted that it had "promptly admonished the Jury to disregard it and we will proceed from that point."

Defendant contends that Detective Ptak's reference to defendant's parole status violated the trial court's ruling, was inadmissible, and requires a new trial. Specifically, defendant claims that Detective Ptak impermissibly said "his" parole officer, not "a" parole officer. However, the trial court heard the detective's testimony as well as the tape of the testimony as taken by the court reporter. Based upon its observations, the trial court ruled that it was an inadvertent mistake on the detective's part and that the detective had not said the word "his." Upon review, we find nothing in the rec-

ord from which we can conclude that the trial court's factual findings were against the manifest weight of the evidence.

Defendant further suggests reversible error in another reference to his parole status that was made by Detective Ptak. According to the transcript, the assistant State's Attorney asked the detective if the defendant stated why he did not call the police upon discovering the bodies. Specifically, the prosecutor asked if defendant "told you in response to that question that he was afraid that they would put him into it and he stated to you that he was on parole, is that correct?" The detective answered, "Yes, he did." Defense counsel's objection to this exchange was overruled.

Defendant claims that Detective Ptak's testimony on this second occasion violated the trial court's ruling. The record reflects that the detective's testimony did not contravene the court's ruling, however. The trial court specifically held admissible defendant's remarks to the detective that defendant was afraid he would be blamed for the murders because he was on parole. Upon review, defendant does not argue that the trial court was in error to hold that such testimony would be admissible. As a result, we find defendant's argument with respect to Detective Ptak's testimony inadequate basis to disturb his convictions.

## PROSECUTORIAL REMARKS DURING CLOSING ARGUMENT

Defendant argues that he is entitled to a new trial because the State's rebuttal argument stressed that he had no defense, thereby shifting the burden of proof from the State to the defendant.

Generally, a prosecutor is granted considerable latitude during closing argument, and the trial court's determination with respect to the propriety of challenged comments is a matter within the court's sound

discretion. (*People v. Johnson* (1992), 149 Ill. 2d 118, 145.) In reviewing a claim of reversible error in remarks made by the State during closing argument, the comments must be considered in the context of the entire closing statements of the parties. *People v. Pasch* (1992), 152 Ill. 2d 133, 207.

According to the record, defense counsel indicated in his closing argument that the State's evidence was insufficient to prove defendant guilty beyond a reasonable doubt. Counsel pointed out that there were no fingerprints at the scene to link defendant to the murders. In rebuttal, the prosecutor responded that the defendant's "fingerprints" were the bullets found in the victims, which corresponded with the bullet recovered from the store. The prosecutor then made the following remark during rebuttal closing argument:

> "No fingerprints? That's ridiculous, absolutely ridiculous.
>
> What is the defense in this case, what in the world is the defense in this case, I was listening and I don't know, I don't know what the defense in this case \*\*\*."

Defense counsel interposed an objection to these statements. The trial court overruled the objection, noting that the State could argue reasonable inferences based on its theory of the case.

Defendant claims that these remarks were calculated to inform the jury that defendant could not be acquitted if he had no defense, and thereby placed an improper burden on the defendant. The defendant stresses that the burden of proof never shifts to the accused, but remains the responsibility of the prosecution throughout trial, citing *People v. Weinstein* (1966), 35 Ill. 2d 467.

In our opinion, the comments of which defendant complains in the present case do not approach the objectionable remarks made by the State in *Weinstein*, 35 Ill. 2d 467. In that case, the prosecutor repeatedly advised

the jury that the defendant had the burden to produce evidence creating a reasonable doubt of her guilt. (*Weinstein*, 35 Ill. 2d at 469-70; see also *People v. Leger* (1992), 149 Ill. 2d 355, 397-400.) In the case before us, the State commented on the weakness of the defendant's case, and offered the State's view that the defendant's defense was not believable. We find no reversible error in the remarks. (See *People v. Phillips* (1989), 127 Ill. 2d 499, 527.) In the present case, the prosecution's statements questioning the soundness of the defendant's theory of defense did not amount to an improper shifting of the burden of proof to the defendant.

## SUFFICIENCY OF THE EVIDENCE TO PROVE ARMED ROBBERY

The elements of armed robbery are the taking of property from the person or presence of another by the use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1985, ch. 38, par. 18—2.) Depriving the victim of property is thus a "critical element" to the crime of robbery. (*People v. Robinson* (1981), 92 Ill. App. 3d 397, 398.) Defendant claims that his armed robbery convictions should be reversed because the State failed to prove beyond a reasonable doubt that any property was taken from the victims' apartment.

With regard to the evidence proving defendant guilty of armed robbery, the record indicates as follows. Detective Rochowicz testified that in his inspection of the victims' apartment, he found a woman's large satchel-type purse on the kitchen table. The purse was wide open and all of the contents, including a wallet with identification, had been taken out of the purse. The detective testified that everything from the purse had been "tossed and turned" out onto the table in disarray. The officer stated that only change, but no paper currency, was found at the scene. In addition, the detective stated that one of the victims (Williams) was found with

a black purse wrapped around her neck. Clothes and other items that had been stored in dressers in the bedrooms were pulled from the furniture and tossed about the rooms, in complete disarray.

Defendant notes that the State introduced no direct evidence that the victims were in possession of paper money before they were assaulted by the defendant. In an appeal from a conviction for armed robbery, it is not our function to reweigh the evidence or retry the defendant; rather, it is the role of the finder of fact to assess the credibility of the witnesses and the weight to be accorded their testimony, as well as the reasonable inferences to be drawn from the evidence. Our duty is a more limited one: to determine whether all of the evidence, direct and circumstantial, when viewed in the light most favorable to the prosecution, would cause a rational fact finder to conclude that the essential elements of the crime had been proved beyond a reasonable doubt. We must not set aside the conviction unless the evidence is so unsatisfactory or improbable that it leaves a reasonable doubt of the defendant's guilt. *People v. Burrows* (1992), 148 Ill. 2d 196, 224-25, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

It is well established that the elements of armed robbery may be proved by circumstantial evidence. (*People v. Williams* (1987), 118 Ill. 2d 407, 415.) A defendant's taking of property may be inferred from the circumstance that money or property is no longer in the place where it is habitually placed. See, *e.g., People v. Jett* (1935), 361 Ill. 373, 375 (evidence that money was missing from cash register after incident); *People v. Susanec* (1947), 398 Ill. 507, 512-13 (watch missing after incident); *People v. Morando* (1988), 169 Ill. App. 3d 716, 724-25 (testimony established that victim had been seen wearing ring earlier in day, but that ring was missing

immediately after victim's death); *People v. Generally* (1988), 170 Ill. App. 3d 668, 672-73 ("[s]urely defendant did not leave the money there when his purpose for approaching the victim in the first place was to rob him" and the absence of the money, "albeit circumstantial, clearly supports the jury's verdict"); *People v. Whitley* (1974), 18 Ill. App. 3d 995, 999 (circumstance that victim testified he had placed money in pants pocket, and that he discovered money was missing after defendants left the room; "[a]bsent a credible accounting for the missing money, the reasonable inference drawn from the[se] *** circumstances supports the jury's conclusion that the defendants had taken the money"); *People v. Lee* (1991), 222 Ill. App. 3d 436, 441-42 (defendant demanded to know location of victim's purse; purse later missing); *State v. Olson* (Mont. 1930), 287 P. 938 (evidence sufficient to prove armed robbery where victim's vest pocket torn and it was established that victim carried his wallet in this pocket).

Under the facts of the present case, we conclude that it was not unreasonable for the jury to infer that the victims had been in possession of money, whether paper or coin currency, which was no longer found at the scene and had been taken by the defendant during the course of a robbery. The evidence in the present case showed that the victims had been in possession of some amount of cash, whether paper currency or coin. In fact, when police arrived at the scene, they found money, in the form of coins, still left at the apartment. A purse was found on the kitchen table. All of the contents of the purse had been "tossed and turned" onto the table. Another purse was found tied around a victim's neck. The overall condition of the apartment indicated that it had been ransacked. No paper currency was left in any of the women's purses, nor in any other place in the apartment. Based upon the presence of coin money in the

apartment, the condition of the women's purses and their other belongings, the state of the apartment, and the defendant's statement that he and Battles had gone to the apartment in order to rob the victims, we believe that the circumstantial evidence was sufficient for a rational trier of fact to find all of the essential elements of armed robbery beyond a reasonable doubt.

Defendant relies upon *People v. Taylor* (1984), 101 Ill. 2d 508, to support his argument that there was insufficient evidence to prove him guilty of armed robbery. In *Taylor*, this court found insufficient the State's circumstantial evidence that the defendant had committed an armed robbery. An eyewitness testified that he had seen the defendant bend over the victim's body, but could not say with certainty whether the defendant had taken anything from the victim's person. In addition, although it was established that the victim normally wore a watch and had cashed his paycheck earlier during the day, it was also proven that the victim had been drinking and had become intoxicated before he was assaulted by the defendant. Defendant suggested that because of his intoxication, the victim "could have spent all of his money earlier that day and given away or lost his watch and wallet." (*Taylor*, 101 Ill. 2d at 514-15.) This court determined that the evidence was "inconclusive that a robbery was committed," because there was "no evidence that the deceased was possessed of money or a watch" before he was accosted by the defendant, and the "testimony of [the eyewitness] offer[ed] little support for the theory that anything was taken from [the victim]." *Taylor*, 101 Ill. 2d at 515.

We believe that the facts of the instant cause are distinguishable from *Taylor*. Unlike the accused in that case, the defendant here admitted that he and Battles went to the victims' apartment in order to take money from the victims. In addition, the condition of the scene

and the victims' bodies once they were found by authorities were such as to raise a reasonable inference that the victims had been robbed.

Also, unlike the present case, other reported decisions have hinged upon the fact that there was some proof that the defendant had not deprived the victim of possession of any money or other property (see *People v. Triplett* (1985), 138 Ill. App. 3d 1070, 1073-74 (victim testified that defendant took nothing from her); *People v. Gaines* (1981), 88 Ill. 2d 342, 368 (evidence showed that only one victim gave up property to defendant); see also *People v. Robinson* (1981), 92 Ill. App. 3d 397, 399 (no testimony that defendant took property from two of the several victims at the scene); *People v. McHerron* (1983), 117 Ill. App. 3d 1022, 1025-26 (no testimony that defendant took property from all of the victims at the scene)) and many pertained to offenses that did not take place in a residence (see *Taylor*, 101 Ill. 2d 508; *People v. Ohle* (1951), 408 Ill. 228, 242-43; *People v. Parker* (1989), 192 Ill. App. 3d 779, 786-87). In contrast, the instant offenses took place in a private dwelling, and the condition of the victims and their belongings provided strong circumstantial evidence that they had been robbed.

In light of all of these considerations, we find defendant's contention insufficient basis to reverse his armed robbery convictions.

## EFFECT OF ARMED ROBBERY CONVICTIONS ON DEATH SENTENCE

Defendant asserts that his death sentence should be vacated because he was found eligible for this penalty solely because the murders occurred during the course of an armed robbery. Defendant urges that because the State failed to prove the commission of an armed robbery, his death sentence cannot stand. We disagree. As stated above, we conclude there was sufficient evidence to prove defendant guilty of armed robbery. Because we

affirm defendant's armed robbery convictions, we do not consider defendant's claim that his death sentence should be vacated for lack of evidence that he was guilty of armed robbery.

## VOLUNTARINESS OF JURY WAIVER FOR DEATH SENTENCE HEARING

Defendant claims that he did not knowingly and intelligently waive his right to be sentenced by a jury, because the trial court did not advise him that the vote of one juror would be sufficient to prevent imposition of a death sentence.

This argument has been repeatedly rejected by this court. (See *People v. Ramey* (1992), 152 Ill. 2d 41, 59-60; *People v. St. Pierre* (1992), 146 Ill. 2d 494, 511; *People v. Henderson* (1990), 142 Ill. 2d 258, 334-35; *People v. Ruiz* (1989), 132 Ill. 2d 1, 20-21; *People v. Guest* (1986), 115 Ill. 2d 72, 107; *People v. Buggs* (1986), 112 Ill. 2d 284, 292; *People v. Madej* (1985), 106 Ill. 2d 201, 220-21; *People v. Albanese* (1984), 104 Ill. 2d 504, 534-36.) In *Ramey*, 152 Ill. 2d 41, the defendant argued that his waiver of a jury for the death sentencing hearing was not knowing and voluntary, because he had not been informed that the vote of one juror could preclude imposition of the death penalty. In finding his argument unpersuasive, this court observed that under Illinois law, "it is sufficient, for a valid jury waiver, that *** the trial court explain to the defendant that he is waiving the right to have a jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the judge alone." (*Ramey*, 152 Ill. 2d at 59, citing *People v. Ruiz* (1989), 132 Ill. 2d 1, 20-21.) This court concluded that "[i]nasmuch as the defendant need not know of the nonunaminity rule before his jury waiver will be held to have been knowing, intelligent and voluntary, what he would have done had he known of the rule is simply irrelevant to that determination and is an insufficient

basis for a contrary conclusion." *Ramey*, 152 Ill. 2d at 60.

We find the reasoning of *Ramey* equally applicable to the present case. The record indicates that defendant consulted with counsel before defendant reached his decision, and that defendant advised the trial court that he understood the consequences of his waiver, a view shared by defendant's trial counsel. (*People v. Morgan* (1986), 112 Ill. 2d 111, 140-42.) Consequently, the record supports a determination that defendant's death sentence jury waiver was knowing, intelligent and voluntary. (*Henderson,* 142 Ill. 2d at 334.) It was not incumbent on the trial court to advise defendant of the juror-nonunanimity rule. The circumstance that defendant might have decided differently had he known of the nonunaminity rule does not render his jury waiver invalid. *Ramey*, 152 Ill. 2d at 59-60; *Guest*, 115 Ill. 2d at 107.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY STATUTE

Defendant challenges the constitutionality of the Illinois death penalty statute on several grounds. First, defendant claims that the statute violates the eighth and fourteenth amendments because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation. This argument has been rejected (see, *e.g., People v. Hampton* (1992), 149 Ill. 2d 71, 116-17), and we adhere to that position in the instant cause.

Defendant also urges that the statute is unconstitutional because it does not sufficiently minimize the risk that the death sentence will be arbitrarily or capriciously imposed. As stated in its prior decisions, however, this court does not accept the validity of such a claim. *Hampton*, 149 Ill. 2d at 115-16 (citing *People v. Johnson* (1991), 146 Ill. 2d 109, 154, and *People v. Whitehead*

(1987), 116 Ill. 2d 425, 465; *People v. Williams* (1991), 147 Ill. 2d 173, 264-66).

## STATE'S CROSS-ARGUMENT REGARDING DEFENDANT'S ELIGIBILITY FOR DEATH PENALTY

The State argues that the defendant should have been found eligible for the death penalty under section 9—1(b)(3) of the Code, which states that a defendant is eligible for the death penalty if he is convicted of murder and the evidence shows that the defendant committed the killing intentionally. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3).) Having found the defendant eligible under section 9—1(b)(6), however, on the ground that the murders were committed during the course of an armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)), we do not address the State's argument on this point.

For the reasons stated above, we affirm the judgment of the circuit court of Cook County. We direct the clerk of this court to enter an order setting Tuesday, September 12, 1995, as the date on which the sentence of death entered by the circuit court is to be carried out. The defendant shall be executed in a manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where the defendant is now confined.

*Affirmed.*

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that we should affirm Wiley's murder convictions. I dissent because I would reverse Wiley's convictions for armed robbery and remand for a new sentencing hearing.

Under our form of jurisprudence, the State must prove the essential elements of a crime beyond a reasonable doubt. Although circumstantial evidence may sometimes suffice to meet that burden, a conviction cannot be founded upon speculation or conjecture. (See *People v. Burnside* (1985), 133 Ill. App. 3d 453, 458.) Such a result is unconstitutional. A conviction based on a record lacking any relevant evidence as to a crucial element of the offense charged violates due process. (*Vachon v. New Hampshire* (1974), 414 U.S. 478, 480, 38 L. Ed. 2d 666, 669, 94 S. Ct. 664, 665.) That is the case with respect to Wiley's convictions for armed robbery.

Contrary to what the majority may say, no rational trier of fact could have found, beyond a reasonable doubt, that Wiley took property from any of the victims. The only thing we can tell with certainty from this record is that the apartment was thoroughly searched, a purse was emptied, and coins were left at the scene. From these facts the majority deduces that additional money must have been found and taken, presumably some or all of the $5,000 in cash Wiley had left with one of the victims. That, however, does not follow at all. It is at least equally possible that the search was unsuccessful. The victim, after all, had claimed that she no longer had the $5,000 and that Wiley would have to wait for it. The ransacked appearance of the apartment may have resulted simply because Wiley and Battles had to look everywhere before realizing that the victim was telling the truth and that the cash was, in fact, gone.

As for the loose coins, pocket change reveals nothing. Not everyone is fortunate enough to be able to keep paper currency in the house, and there is nothing about loose coins that suggests that dollar bills must also have been present. To the contrary, the coins could have been there precisely because the bills had all been spent and they were all that was left.

The most one can say of the evidence is that it is inconclusive. That something was actually taken is not foreclosed by this evidence, but it is not established by it either. Because there is no principled basis for the jury to decide as it did, the convictions for armed robbery should be reversed. Because those convictions were the sole predicate for Wiley's death sentence, the sentence of death should, in turn, be vacated, and the cause should be remanded for a new sentencing hearing.